**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JEAN ZAWLOCKI, GARY LONG, MICHAEL VESPA, RICHARD JOHNSON, DEBORAH KETCHNER, JAMIE COLLIER, HERMAN GERHARD, PAUL RINKE, JAMES BEDWORTH, GARY MULZER, DOUGLAS GENTRY, JAMES SANDEEN, MEL PATTON, DEREK HINES, JEFFREY VINSON, RUSSELL ALLES III, EUGENE HRYNEWICH, ENRIQUE SALDANA, MICHAEL BABYAK, RON PEARSON, J. MICHAEL SABATINI, LARRY PLANTRICH, for themselves and as class representatives,

        Plaintiffs,

v.

RAMA TECH, LLC, a Michigan limited liability company, RAMA TECH, LLC MEDICAL PLAN, RAMA TECH INDUSTRIES, LLC, a Delaware limited liability company, RAM THULURI, RANI THULURI, and NUKO PRECISION, LLC, a Michigan limited liability company, and COMERICA BANK, a Michigan corporation

        Defendants
_____/

CASE NO. 03-60159

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Comerica Bank's ("Comerica") Motion to Dismiss Plaintiffs' claims against Comerica under Fed.R.Civ. 12(c) or for Summary Judgment under

1

Fed.R.Civ.P. 56(b) (Doc. # 78).[1] The Court heard oral argument on June 13, 2005. At the conclusion of the hearing, the Court took the matter under advisement.

For the reasons stated below, the Court GRANTS Defendant's motion.

## I. STATEMENT OF FACTS

Plaintiffs filed this class action lawsuit against their former employer, Rama Tech, its former President, Defendant Ram Thuluri, its member, Defendant Rani Thuluri, and Rama Tech's secured lender, Defendant Comerica Bank ("Comerica"). In addition, Plaintiffs have named Nuko Precision, LLC, the business started by the Thuluris after funding for Rama Tech ceased, as a Defendant.

Rama Tech, a local supplier to the automotive industry, closed its business and terminated its employees on December 19, 2002. Plaintiffs assert that Comerica and its agents made the decision to close Rama Tech without giving layoff notice as required by the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101 et seq., and failed to pay benefits in violation of Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1).

Comerica began its relationship with Rama Tech in 1999, with loan facilities brokered by loan officer, Michael Malaga. The relationship continued, and eventually, Rama Tech had a working capital line of credit with a maximum loan balance of $6.5 million, a mortgage note, and several term notes.

In 2002, Rama Tech's financial success waned. The company battled customers

---

[1] The Court heard argument on the individual Defendants and Nuko Precision, LLC's Motion for Summary Judgment at the same time. That motion is resolved by separate Opinion and Order

over quality concerns and lost revenues because of quality-related set-offs by customers. Comerica's Ex.G at 3. Rama Tech also incurred significant expense when it retooled for a project with Delphi, which never came to fruition. Id. In May 2002, Ram Thuluri hired a new CEO, Greg Bird, to run the company. Comerica's Ex. E at 51. Ram Thuluri stepped down as President and CEO and relinquished operational control of the company to Bird. Thuluri maintained a supervisory role for quality control, but Bird was in charge of overall operations. Comerica's Ex. C at 18, 31; Ex. G at 3.

After Rama Tech went out of formula on its line of credit and breached several covenants under the loan agreements, Comerica entered into a forbearance agreement on July 26, 2002. Comerica's Ex. D. Pursuant to the agreement, Comerica authorized overformula funding of $1 million under the line of credit. As a condition of the agreement, Rama Tech hired a workout consultant–Conway, McKenzie and Dunleavey ("CM&D") to provide day-to-day financial advice. Bird negotiated and signed the agreement. Also, Comerica required Rama Tech to remit all monies received to the Comerica cash collateral account. Id. at 71. The funds were used to pay down the line of credit Comerica had extended. Id. at 72. Rama Tech, through CM&D, made funding requests to Comerica. Id. Checks could only be issued and sent if Comerica approved. Pls.' Ex. D, Dep. of Ram Thuluri at 28-9. Comerica extended the forbearance agreement several times.

Comerica learned of possible customer pullouts in the Fall of 2002. Comerica's Ex. L. Comerica, in conjunction with Rama Tech and CM&D, negotiated with Rama Tech's major customers to reach accommodations agreement that included various commitments to continue business with Rama Tech. At a December 18, 2002 meeting, involving Comerica, Rama Tech and its customers, the parties attended with the expectation that an

agreement was possible and that Rama Tech had the potential to continue as a going concern. Comerica's Exs. E at 30-31, M, N, and O at 53-54. All of Rama Tech's customers agreed to a six-month commitment; however, three of the five major customers declined to commit to an 18-month term. Comerica's Ex. F at 65; Ex. E an 103. Comerica decided not to provide further loans to Rama Tech, and consequently, it asserts, Rama Tech's management made the decision to shut down. Comerica's Ex. E at 25. 34-35, and P. The employees received a notice announcing the shut-down on December 20, 2002. Comerica's Ex. Q.

At the time operations ceased, an ERISA governed medical plan, the Rama Tech, LLC, Medical Plan ("Plan"), was in effect. Every month Rama Tech, the Plan Sponsor, paid an administrative fee to American Medical Security ("AMS"), who handled claims under the Plan and advised Rama Tech of the amount of employee claims that had to be paid. Employees paid a portion of the costs of the Plan through payroll deductions. Rama Tech funded the payment of the claims. This arrangement continued through November 2002. After Rama Tech's check for AMS's administrative fee for December 2002 was returned for nonsufficient funds, AMS canceled its contract with Rama Tech.

According to Rama Tech, it sought Comerica's approval to pay this check and had received it from Peter Guilfoile. Later, Comerica refused to honor the check. All employee medical claims also were unfunded because Comerica refused to allow Rama Tech to pay them. In addition, employees did not receive a refund of their payroll contributions.

## II. STANDARD OF REVIEW

In evaluating a Rule 12(c) motion for judgment on the pleadings, "the court must view the pleadings in the light most favorable to, and draw all inferences in favor of, the

nonmoving party." Madonna v. United States, 878 F.2d 62, 65 (2d Cir. 1989). The Court may grant the motion "only if no relief could be granted under any set of facts that could be proved." Turbe v. Government of the Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991) (citation omitted). If a complaint contains "even the most basic of allegations that, when read with great liberality, could justify plaintiff's claim[s] for relief, motions for judgment on the pleadings should be denied." Id.

Pursuant to Fed. R. Civ. Proc. 56(c), a motion for summary judgment is to be granted only if the evidence indicates that no genuine issue of material fact exists. To avoid summary judgment, the opposing party must have set out sufficient evidence in the record to allow a reasonable jury to find for him at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

The sufficiency of the evidence is to be tested against the substantive standard of proof that would control at trial. Anderson, 477 U.S. 242. The moving party has the burden of showing that there is an absence of evidence to support the non-moving party's case. Celotex v. Catrett, 477 U.S. 317, 325 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. In disposing of a motion for summary judgment, this Court must consider the evidence in the light most favorable to the nonmoving party, but may weigh competing inferences for their persuasiveness. Matsushita, 475 U.S. at 574.

### III. DISCUSSION

    **A. Motion to Dismiss**

Comerica maintains that Plaintiffs' supplemental responses to Comerica's interrogatories contain no facts to support a theory that Comerica is a party liable under WARN or ERISA. It is neither a WARN employer nor an ERISA plan or administrator. In the absence of any factual reference, Comerica concludes that the claims fail. Therefore, Comerica maintains that the Court should estop Plaintiffs from attempting to raise genuine issues of material fact and award it judgment under Rule 12(c).

Plaintiffs assert that this case should be decided on its merits, not pleading technicalities, and suggest that Comerica should have filed a motion to compel if it believed that Plaintiffs have not complied with the rules in responding to its discovery requests. This Court declines to award judgment on the pleadings for the reasons stated below.

### 1.  WARN

Despite Comerica's position that it is entitled to judgment on the pleadings, the Court finds that Plaintiffs' allegations and responses to discovery satisfied their pleadings burden as to the WARN claim. Specifically, Plaintiffs included the following allegations in their Second Amended Complaint ("SAC").

> 57. Comerica and its agents solely made the decision to close Rama Tech on or about December 19, 2002, and provided no notice of the closing to the Plaintiffs.
>
> 67. During a meeting with Ram Thuluri and Rani Thuluri on or about December 19, 2002, Comerica and its agents solely decided that Rama Tech will not be able to survive as a corporation.
>
> 68. Rama Tech conducted a mass lay-off and/or plant closing on or about December 19, 2002.

SAC at ¶¶ 57, 67-68.

Neither the WARN Act itself nor the Department of Labor's regulations (the "DOL

Regulations") promulgated to implement it explicitly authorize suits against lenders such as Comerica. See e.g. Pearson v. Component Tech. Corp., 247 F.3d 471, 491-92 (3d Cir. 2001). Nevertheless, three circuits have held that a lender may be liable under the WARN Act if its relationship with the indebted employer meets certain criteria. Pearson, 247 F.3d 471 (3d Cir.2001) (applying DOL regulations); Adams v. Erwin Weller Co., 87 F.3d 269 (8th Cir. 1996) (assessing degree of lender's involvement in borrower's affairs) ; Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572 (AFL-CIO) v. Weslock Corp., 66 F.3d 241 (9th Cir. 1995) (observing that WARN's obligations can apply to a secured creditor, but only where the creditor operates the debtor's asset as a "business enterprise" in the "normal commercial sense").

Under the various standards articulated, this Court finds the absence of an explicit allegation that Comerica was Plaintiffs' employer is not necessary. Notably, Plaintiffs do allege that Comerica "and its agents acted as a de facto corporation and took control of Rama Tech in October of 2002. SAC at ¶ 56. This allegation could reasonably support the conclusion that Comerica was "operating Rama Tech as a business enterprise in the normal commercial sense, see Weslock, 66 F.3d at 244; that a factfinder could reasonable infer that Comerica had "become [] so entangled with [Rama Tech] that it had assumed responsibility for the overall management of the borrower's business;" Adams, 87 F.3d at 272 (citation omitted); or that the amount of control exercised by Comerica exceeded that necessary to protect its security interest, see Pearson, 247 F.3d at 495-97.

Therefore, the Court rejects Comerica's contention that Plaintiffs failed to plead this claim, and denies its Rule 12 (c) motion on this issue.

**2. ERISA**

Comerica cites Plaintiffs' Second Amended Complaint to support its position that dismissal of Plaintiffs' ERISA claim is warranted. Plaintiffs entitled their ERISA count, "CLAIM UNDER 29 U.S.C. § 1132(a)(1)(B)–ERISA CLAIMS." See SAC at ¶ 13, (emphasis in original). The statutory provision cited supports a participant's claim for denial of benefits by the plan or plan administrator, not a claim for breach of fiduciary duty.

In Everhart v. Allmerica Fin. Life Ins. Co., 275 F.3d 751, 753 (9th Cir. 2001) the appellate court held that a claim for a money judgment must be brought against the "plan as an entity" and not against any person unless "liability is established in his individual capacity." Here, is it undisputed that Comerica is neither a plan nor an administrator. Nevertheless, Plaintiffs made clear in their responses to interrogatories that they proceeded on a theory that Comerica acted as a fiduciary. See Comerica's Ex. U. Plaintiffs specified that they were making a claim under § 1132(a)(2) for relief for a breach of fiduciary duty. Id. Comerica was aware of the basis of Plaintiffs' ERISA claim. Therefore, the Court also denies this request of Comerica's for dismissal under Rule 12(c). The Court will proceed to review both the WARN and ERISA claims on their merits.

**B. Motion for Summary Judgment**

**1. COMERICA's status as an employer under WARN**

Comerica asserts that the undisputed facts show only that Comerica decided not to further fund Rama Tech and concludes that Plaintiffs have failed as a matter of law to show Comerica acted as an employer. Plaintiffs believe that questions of fact exist as to whether Comerica operated Rama Tech at the time it was closed and whether Comerica ordered the closing of Rama Tech.

Under WARN, liability attaches only to the party that orders a plant closing. Administaff Cos. v. New York Joint Bd., Shirt & Leisurewear Div., 337 F.3d 454 (5th Cir. 2003) (rejecting a joint-employer test and holding that a company hired to provide "personnel management, payroll, and administrative services for other businesses, essentially operating as an off-site human resources department" was not liable as an employer under the WARN Act).  In Pearson v. Component Technology Corp., 247 F.3d 471 (3d Cir.), cert. denied, 122 S.Ct. 345 (2001), employees brought suit against a secured lender and the debtor/employer, alleging violations of the WARN Act for failure to provide sixty-day notice of the plant closing.  The Pearson court reviewed earlier decisions and noted that courts analyzed the liability of affiliated corporations under three theories: traditional veil piercing theories, the integrated enterprise test, and direct liability.  It found the approaches wanting, noting the inconsistency generated by the various methods as well as the conflicting results that can be produced.  The Pearson Court opted for a simpler approach:  apply the same test for liability regardless of the formal label the corporations have attached to their association.  It adopted a functional approach under the WARN Act "by focusing on the nature and degree of control possessed by one corporation over another." Id. at 478.  The analysis takes into account any "arrangements that bear on the question whether the two companies failed to maintain an arm's-length relationship."  Id.  The factors considered include those listed in the DOL regulation:  (i) common ownership, (ii) common directors and/or officers, (iii) unity of personnel policies emanating from a common source, (iv) dependency of operations, and (v) de facto exercise of control.  Id. at 483.

In Weslock Corp., 66 F.3d 241, 245  (9th Cir. 1995), the Ninth Circuit followed a

9

different test for lender liability under WARN. It held that a secured lender can be liable when it operates the business enterprise in the "normal commercial sense." Id. Because the secured lender in that case imposed only financial controls, that court found it was not an employer for WARN Act purposes.

Under the test articulated by the Eighth Circuit in Adams v. Erin Weller Co., 87 F.3d 269 (8th Cir. 1996) (finding the secured lender was not an employer because it merely restricted the borrower's financial and business activities, monitored business and participated in management to protect its investment), the court addressed whether a lender's involvement with its borrower's business affairs made it an employer for purposes of WARN. In that case, after the lender refused to extend additional credit, the employer decided to close the plant without providing notice. The Adams Court held that the lender may become liable when it becomes so entangled with the borrower that it has assumed responsibility for the overall management of the borrower's business.

Given the guidance of these opinions, the Court concludes that Comerica's argument that a decision to close is not an order to close simply begs the issue. No Defendant has admitted to authorship of the December 20, 2002 memo that notifies workers that Ram Tech is closed. The only written announcement of the closing indicates it was from Ram and Rani Thuluri; however Thuluris disavow authoring the memo. This dispute does not raise a genuine issue of material fact, however, because authorship of the memo is not dispositive of liability. Instead, the focus is on either the degree of control Comerica exercised over Rama Tech[2], or whether Comerica's actions went beyond

---

[2]Plaintiffs do not advance any argument as to the other DOL factors identified by the Pearson court as warranting consideration--common ownership, common directors,

conduct deemed usual for a lender loaning large sums of money. See Pearson, 247 F.3d at 477; see also Adams, 87 F.3d at 272 (refusing to hold a lender liable for WARN Act violations because the lender's control was not "unusual for a lender loaning over eighteen million dollars"); Weslock, 66 F.3d at 245 (refusing to hold lender liable because the control exercised was "consistent with the type of control a secured creditor legitimately may exercise over a defaulting debtor") (quotations omitted)). Consequently, the Court directs its attention to that conduct identified by Plaintiffs as a measure of Comerica's de facto control of Rama Tech.

In support of the characterization that Comerica exercised de facto control, Plaintiffs rely on Ram Thuluris' assertion that "all substantive operating decisions had to be approved by and were made by Comerica." Decl. Of Ram Thuluri at ¶¶ 6-9. Specifically, Plaintiffs assert that Comerica forced Rama Tech to hire CM&D; that a lockbox arrangement precluded money from coming into the control of Rama Tech; that Comerica made decisions about working capital, even before the closing of Rama Tech; and that Comerica met with customers and attempted to orchestrate agreements. Although Plaintiffs' assertions are worthy of consideration, Plaintiffs have presented no evidence to support a genuine issue of material fact as to Comerica's status as an employer. In short, although the testimony of the Ram Thuluri suggests that Comerica may have been in control, the documents submitted show to the contrary.

According to Plaintiffs, the lockbox was used as a treasury management tool by Comerica. Rama Tech's customers who paid by mail were required to send checks directly

---

common source of personnel policies--and the Court finds they favor Comerica's position.

to the lockbox, rather than to Rama Tech. Pls.' Ex. C, Malanga Dep. at 65.  Notably, Rama Tech was under a lockbox from the outset of its relationship with Comerica.  Comerica's Ex. C, Malaga Dep. at 67.  It was not instituted in late 2002, the time Plaintiffs assert that Comerica assumed the functional operation of Rama Tech.  Therefore, the use of the lockbox, in and of itself, does not create an inference of control inconsistent with Comerica's status as a lender.

Comerica, who has the burden on summary judgment to show as a matter of law that it is not an employer, has provided unrefuted evidence that its control was limited to protecting its security interest.  The evidence shows that Comerica was seeking a "formal accommodation" agreement whereby the bank promises continued funding to customers who offer it accommodations such as waiver of setoff, expedited payment, or something else the bank wanted.  Ex. E, Malaga Dep. at 31.  Moreover, there is no evidence that Comerica ever refused a request by Rama Tech for funding, the evidence instead shows that Comerica decided to stop advancing a line of credit.

Plaintiffs' position is further undermined by the absence of evidence that Comerica supervised or hired employees. The records shows that Rama Tech's restructuring request to Comerica was "contingent upon Mr. Thuluri's full agreement to engage an outside operational/financial consultant in the event that Rama Tech does not realize its expected cost savings. . .or has an additional formula need."  Def.'s Ex. H, ¶ 7; Ex. G.  Although Ram Thuluri testified that Comerica "forced" Rama Tech to hire CM&D, Brian Connors, director of CM&D, stated that Byrd signed the engagement letter on behalf of Rama Tech. Connors added that he did not "take direction from Comerica regarding the engagement."  Def.'s Ex. J, Decl. Of Connors.  According to Connors, there were no meetings between Comerica

12

and CM&D at which Rama Tech was not present. Id. The scope of CM&D's engagement included review of financial projections and statements, review of historical operational data, performance date, review of vendor/supply issues, but did not include hiring or firing of personnel, modification of implementation of personnel policies or procedures, including policies related to employee benefits, supervision of sales and marketing efforts. Id. As noted In Adams, a defendant-lender's security interest in the debtor-employer's assets, its influence over the employer's financial decisions during the period of delinquency, and its demand that the employer hire a consultant to help the employer improve its financial performance, did not suggest that the lender was "actually in control of the [employer's] business operations." Id. at 272. Rather, these were indicia of a "major lender's attempt to work with a troubled borrower and nurse it back to financial health." Id. A prerequisite for lender liability is that whatever responsibility the lender may have assumed for the borrower's business, such responsibility must have been for the 'ordinary operation' of the business. Thus, as in bankruptcy law, the lender may not be liable under WARN for 'winding up' or foreclosure activities not taken as part of an effort to operate the business in the 'normal commercial sense'. . . ." Pearson, 247 F.3d at 497 (quoting Weslock, 66 F.3d at 245).

Here, Comerica's conduct reflects its decision to protect its security interest. It acted to preserve business assets; hence, the notice requirement of WARN does not apply to it. There is no evidence that Comerica was involved in the functional operations of Rama Tech. Plaintiffs do not assert that Comerica participated in decisions about production output, marketing, employment practices or quality control. The absence of such conduct was dispositive in Westlock, see 66 F.3d at 244-45, and it is dispositive here.

Further, the Court rejects Plaintiffs' contention that Comerica was required to continue funding it through the six-month period Rama Tech's customers had committed to continue doing business with Rama Tech to meet WARN obligations. The statute does not impose any such obligation on lenders, absent a lender's involvement as an employer.

In sum, the Court finds that Comerica is entitled to summary judgment on Plaintiff's WARN claim. Accordingly, the Court declines to resolve Comerica's alternative arguments that it is entitled to summary judgment on two affirmative defenses available under WARN: (1) the unforeseeable business circumstances exception; or (2) notice would have prevented the acquisition of working capital.

### 2. Liability for benefits under ERISA

The parties disagree as to whether Comerica attained fiduciary status under ERISA. According to Comerica, there is no evidence in the record that Comerica was a plan fiduciary. Plaintiffs assert that it is a fiduciary under ERISA because it took proceeds out of Plaintiffs' checks and did not use them to pay for benefits. According to Plaintiffs, Comerica's failure to apply the funds violated its fiduciary duty under ERISA. Bannistor v. Ullman, 287 F.3d 394, 401-407 (5th Cir. 2002).

For purposes of ERISA, Congress provided that a person is a fiduciary with respect to a plan to the extent (I) he exercises any discretionary authority or discretionary control respecting management of such plan or **exercises any authority or control respecting management or disposition of its assets**, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary

14

authority or discretionary responsibility in the administration of such plan. 29 U.S.C. § 1002(21)(A) (emphasis added).

Congress intended ERISA's definition of fiduciary "to be broadly construed." Blatt v. Marshall & Lassman, 812 F.2d 810, 812 (2d Cir. 1987). "Unlike the common law definition under which fiduciary status is determined by virtue of the position a person holds, ERISA's definition is functional." Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993). For example, in Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 61 (4th Cir. 1992), cert. denied 506 U.S. 1081 (1993) (citations omitted), the court emphasized that fiduciary duty under ERISA is not an all-or-nothing concept: that is, the inclusion of the phrase "to the extent" in § 1002(21)(A) means that a party is a fiduciary only as to the activities which bring the person within the definition. The statutory language plainly indicates that the fiduciary function is not an indivisible one. In other words, a court must ask whether a person is a fiduciary with respect to the particular activity at issue.

In determining whether a person is a fiduciary with respect to the particular activity at issue, a court is required to examine the relevant documents to determine whether the conduct at issue was within the formal allocation of responsibilities under the plan documents and, if not, ascertain whether, in fact, a party voluntarily assumed such responsibility for the conduct at issue. Coleman, 969 F.2d at 61. Where, for example, an employer is entrusted with employee funds for remittance to a claims administrator, along with any employer contributions, the employer is acting in a fiduciary capacity under ERISA. Phelps v. C.T. Enterprises, Inc., 394 F.3d 213, 219 (4th Cir. 2005), (citing Broadnax Mills, Inc. v. Blue Cross & Blue Shield of Virginia, 867 F.Supp. 398, 405 (E.D.Va.1994)).

Courts have imposed personal liability under ERISA. See Yeseta v. Baima, 837 F.2d

15

380 (9th Cir. 1988) (an employee in charge of plan administration, who, at the direction of company principals, withdrew plan assets, and placed those assets in the company's account to pay "necessary operating expenses" held personally liable as a fiduciary under ERISA); Connors v. Paybra Mining Co., 807 F.Supp. 1242, 1246 (S.D.W.Va. 1992), appeal dis'd, 21 F.3d 421 (4th Cir. 1993) (company officers and directors exercised authority or control respecting management or disposition of plan assets, and thus were ERISA fiduciaries where they made "personal, conscious choices" to use withheld employee contributions to cover company expenses); Reich v. Cook, 94cv2069, slip op. at 10-11 (D.Conn. Mar. 24, 1997) (defendants fell within the ambit of section 1002(21)(A) where, even though other employees processed checks for their signature, they were the only signatories on the corporate account, and they "retained the authority to instruct those employees as to what checks to process and what monies were to be paid out[ ]").

At oral argument, Plaintiffs maintained that employee payroll deductions went into a lockbox. Tr. at 15. The record, however, shows that the lockbox was used for deposits by suppliers and customers. Tr. at 33, Dep. of Malanga at 40-47. Moreover, the use of a lockbox is not a per se violation of ERISA. Bannistor, 287 F.3d at 402. In this case, it is undisputed that money was withheld from employee paychecks in December 2002. Def.'s Reply, Ex. B. It is likewise undisputed that AMS terminated the plan effective November 30, 2002, after the December check was returned for insufficient funds. Def.'s Exs. H and I. Finally, it is undisputed that Rama Tech requested that Comerica allow it to pay its obligations. Comerica's Ex. K, Dep. of Parilla at 115. According to Plaintiffs, Comerica kept money in trust as a fiduciary and, therefore, had a duty to apply the funds under the Plan.

Although plan assets may include funds withdrawn from wages by an employer, 29 C.F.R. § 2510.3-102, the evidence before this Court does not support Plaintiffs' contention that employee payroll deductions were under the direct control of Comerica. The record reveals that under the imposed funding budget, Rama Tech showed what line item expenses would be required for funding at a particular given time. Tr. at 29-30; Decl. of Malaga at 47. Thereafter, a lump sum would be deposited from the commercial loan servicing area into Rama Tech's general account. Rama Tech used the general account to write checks, process electronic transfers and make deposits. Id. at 35. For example, on December 12, 2002, $410,000 went into the general account, and Rama Tech funded its payroll, the 401K, and Delta Dental. See Tr. at 31. According to Comerica, in the past, Rama Tech wired funds to AMS, but in December 2002, it cut a check, which was presented for payment on December 20, 2002. Because an intervening garnishment and other expenses were presented for payment before the AMS check, the check was returned for insufficient funds. The check was presented a second time on December 27, 2002. Again it was returned. There is no evidence before this Court to create even an inference that Rama Tech had segregated the withheld funds or directed Comerica to segregate the plan assets. There is no evidence to suggest that Comerica implemented a course of action to direct plan assets for payment of monies Rama Tech owed to Comerica. In fact, Comerica approved payment to AMS; Rama Tech wrote a check on December 12, 2002, to AMS and promptly mailed it. Rama Tech approached Comerica with its ERISA obligations after the check was returned.

Plaintiffs have failed to rebut Comerica's motion with anything other than broad, self-serving allegations and finger pointing. Comerica actually approved payment to AMS.

17

Ram Thuluri testified that an intervening judgment prevented the check from clearing. There is no evidence before the Court showing that the amount withdrawn from payroll checks was placed in a discrete account. The money instead went into the general account where it was commingled with other funds. There ERISA assets were not segregated by Rama Tech, and liability for the Plan lies solely with Rama Tech. These fact create no fiduciary obligation on Comerica to pay for Plan benefits.

## V.  CONCLUSION

For the reasons stated above, Comerica's Motion for Summary Judgment is GRANTED. The record shows that Comerica never crossed the line from lender to employer for purposes of WARN and from lender to fiduciary for purposes of ERISA.

s/Marianne O. Battani<br>
MARIANNE O. BATTANI<br>
UNITED STATES DISTRICT JUDGE

Dated: <u>December 9, 2005</u>

### CERTIFICATE OF SERVICE

Copies of this Order were mailed to Kenneth J. Hardin, II, Brad A. Rayle, and G. Christopher Bernard on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt<br>
Deputy Clerk